FARHAD NOVIAN (SBN 118129)
farhad@novianlaw.com
JOON SONG (SBN 281391)
joons@novianlaw.com
**NOVIAN & NOVIAN, LLP**
1801 Century Park East, Suite 1201
Los Angeles, CA  90067
Telephone: (310) 553-1222
Facsimile: (310) 553-0222

Attorneys for Plaintiffs
PARAGON TECHNOLOGY & DEVELOPMENT, INC. and
GATSBY ENTERPRISES, INC.

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA – WESTERN DIVISION

| | |
|---|---|
| PARAGON TECHNOLOGY & DEVELOPMENT, INC., a Delaware Corporation; GATSBY ENTERPRISES, INC., a California Corporation, <br><br> Plaintiffs, <br><br> vs. <br><br> HARVEY BELFER, an Individual; TODD BELFER, an Individual; TO BE LIMITED PARTNERSHIP, an Arizona Limited Partnership; and DOES 1 – 10, <br><br> Defendants. | Case No.: <br><br> **COMPLAINT FOR** <br><br> **(1) FRAUD** <br> **(2) FRAUD** <br> **(3) CONVERSION** <br> **(4) BREACH OF CONTRACT** <br> **(5) VIOLATION OF CALIFORNIA USURY LAW PURSUANT TO CIVIL CODE § 1916-2** <br> **(6) MONEY HAD AND RECEIVED – RECOVERY OF USURIOUS INTEREST PAID** <br> **(7) RESCISSION OF FORBEARANCE AGREEMENT** <br> **(8) RESCISSION OF LOAN AGREEMENTS** <br><br> **AND DEMAND FOR JURY TRIAL** |

Plaintiffs PARAGON TECHNOLOGY & DEVELOPMENT, INC. ("Paragon") and GATSBY ENTERPRISES, INC. ("Gatsby," collectively with Paragon, "Plaintiffs") hereby complain against Defendants HARVEY BELFER ("Harvey Belfer"), TODD BELFER ("Todd Belfer"), TO BE LIMITED PARTNERSHIP ("TBL"), and DOES 1-10 as follows.

## NATURE OF THIS ACTION

1.      This action arises from a pattern of loansharking, usurious loans, fraud, broken promises, bad faith, and threats by Harvey Belfer and his family-controlled limited partnership, TBL, against Plaintiffs and their principals.  Harvey Belfer, Todd Belfer, and TBL took advantage of Plaintiffs, who being involved in the adult entertainment industry did not have access to traditional financing, by providing loans at up to 30% interest and demanding equity without proper consideration as a "sweetener."  Harvey Belfer and TBL have further broken their contractual obligations to assist Plaintiffs in obtaining additional financing, and at least Harvey Belfer has made threats of physical harm against Plaintiffs' principals, including threatening to have his "colorful" organized crime contacts on the East Coast come and "make things bad" for Plaintiffs.  This contrasts with Harvey Belfer and his son and partner TODD BELFER's ("Todd Belfer") images in Arizona as upright businessmen and virtuous members of their community.  In reality, a significant portion of Harvey Belfer and Todd Belfer's income is from the proceeds of the adult entertainment industry.  In particular, Plaintiffs own and operate "iwantclips.com" ("iwantclips.com").

2.      Not content to grow even more wealthy off of their usurious loans to Plaintiffs, Harvey Belfer, Todd Belfer, and TBL engaged in avaricious, unscrupulous conduct by masterminding a plan involving multiple other individuals, including ROBERT LUNNY ("Robert Lunny"), JAMES POWER ("James Power"), and JEFF SWISHER ("Jeff Swisher," collectively with Harvey Belfer, Todd Belfer, and TBL, the "Co-Conspirators"), to forcibly take over Plaintiffs and oust its owners/founders.  Like Napoleon at Waterloo, Harvey Belfer and TBL have failed in their campaign to wrest control of Plaintiffs, and now must answer for their actions.

## THE PARTIES

3.      Plaintiff Paragon is, and at all relevant times was, a corporation incorporated under the laws of Delaware and qualified to do business in California, with its principal place of business in Los Angeles County, California.

4.      Plaintiff Gatsby is, and at all relevant times was, a corporation incorporated under the laws of California, with its principal place of business in Los Angeles County, California.

5.      Defendant Harvey Belfer is, and at all relevant times was, a citizen of the State of Arizona.  Harvey Belfer is an individual domiciled in Maricopa County, Arizona.

6.      Defendant Todd Belfer is, and at all relevant times was, a citizen of the State of Arizona.  Todd Belfer is an individual domiciled in Maricopa County, Arizona.

7.      Defendant TBL is, and at all relevant times was, an Arizona limited partnership with its principal place of business in Maricopa County, Arizona.  TBL is comprised of one general partner and three limited partners.  All of TBL's partners are citizens of Arizona.

        a.      2B GP, LLC is the general partner of TBL.  2B GP, LLC is an Arizona limited liability company with its principal place of business in Maricopa County, Arizona. All of 2B GP, LLC's members are citizens of Arizona.

        b.      Harvey Belfer and Sandra H. Belfer as Trustees of the Belfer Family Trust dated April 30, 1986, restated is a limited partner of TBL.  Harvey Belfer and Sandra H. Belfer are citizens of Arizona who are domiciled in Maricopa County, Arizona.

        c.      Todd Belfer as Trustee of the Todd Belfer Trust is a limited partner of TBL. Todd Belfer is a citizen of Arizona who is domiciled in Maricopa County, Arizona.

        d.      Beth Belfer as Trustee of the Beth Belfer Trust is a limited partner of TBL. Beth Belfer is a citizen of Arizona who is domiciled in Maricopa County, Arizona.

8.      Plaintiffs are unaware of the true names and capacities of the defendants named herein as DOES 1 through 10, inclusive, whether individual, corporate, associates, or otherwise and therefore sue defendants by fictitious names.  Plaintiffs will seek leave of

court to amend this Complaint to set forth the true names and capacities of said defendants if and when the same has been ascertained.  Plaintiffs are informed and believe and thereon allege that DOES 1 through 10, inclusive, and each of them, are responsible in some manner for the wrongful acts, occurrences, and/or omissions alleged herein and for the damages caused to Plaintiffs.

9. Plaintiffs are informed and believe, and thereon alleges, that each of the defendants designated as a DOE is responsible in some manner for the events and happenings herein referred to and caused damages thereby to Plaintiffs as herein alleged. Plaintiffs are informed and believe, and on such information and belief allege, that each defendant herein, in addition to acting for himself, itself and/or on his, her, or its behalf, individually, is, and at all relevant times was, acting as the agent, servant, employee and/or representative of and with the knowledge, consent and permission of each of the remaining defendants and within the course, scope and authority of said agency, service, employment and/or representation.  Plaintiffs are further informed and believe, and on such information and belief allege, that the acts and conduct of each such defendant was fully ratified by each of the remaining defendants herein.  Harvey Belfer, Todd Belfer, TBL, and the defendants designated as DOES 1-10 shall be referred to collectively as "Defendants" where appropriate.

## JURISDICTION AND VENUE

10. The Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332, as there is diversity of citizenship between the parties, and the amount in controversy exceeds $75,000, exclusive of interest and costs.

11. Venue is proper under 28 U.S.C § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claims occurred in this district.  In the alternative, venue is also proper under 28 U.S.C. § 1391(b)(3), as both Harvey Belfer and TBL are subject to the court's personal jurisdiction with respect to this action.  Furthermore, venue is also proper due to the venue provision in one of the contracts relevant to this action.

//

## PERSONAL JURISDICTION OVER DEFENDANTS

12. This Court may exercise personal jurisdiction over Harvey Belfer, Todd Belfer, and TBL for the reasons set forth below, as will be further discussed in the remainder of the Complaint:

e. TBL has consented to the jurisdiction of this Court via an amended and restated promissory note between TBL and Plaintiffs dated August 29, 2019.

f. Harvey Belfer is subject to the jurisdiction of this Court because he has purposefully availed himself of the privilege of conducting activities in California, including entering into agreements with Plaintiffs in California and visiting California on numerous occasions for the purpose of conducting business with Plaintiffs.

g. Todd Belfer is subject to the jurisdiction of this Court because he has purposefully availed himself of the privilege of conducting activities in California, including visiting California on numerous occasions for the purpose of conducting business with Plaintiffs.

h. Harvey Belfer, Todd Belfer, and TBL thus have sufficient relationships with California and the litigation, as will be set forth in more detail in this Complaint, such that traditional notions of fair play and substantial justice are not offended by his defending against this action in California federal court.

## BACKGROUND ALLEGATIONS

13. Paragon is a platform for online adult content that helps hundreds of independent contractor content creators earn livelihoods. Gatsby is a wholly-owned subsidiary of Paragon.

14. Plaintiffs own and operate iwantclips.com, an adult entertainment website where independent content creators can earn livelihoods by posting clips for sale. Plaintiffs, through iwantclips.com, thus empowers tens of thousands of content creators in achieving financial security and success.

15. Plaintiffs were founded by Jude Hudson ("Hudson") and his wife, who are still majority owners, officers, and directors.

16.     It is notoriously difficult for businesses in this industry to obtain traditional financing, such as through banks.  Therefore, Plaintiffs were compelled to deal with Harvey Belfer, a loan shark who profited handsomely by providing loans at extraordinarily high interest rates—*up to thirty (30) percent*—to Plaintiffs.  Harvey Belfer was able to maintain a level of separation and the veneer of respectability in his tony Scottsdale, Arizona enclave by providing loans through TBL, thus ensuring that his neighbors and business associates did not know he was investing in pornography.

17.     These usurious loans were hugely profitable for TBL.  They were also secured by personal guaranties, pledges of shares, and other collateral, which gave TBL legal means to influence and harass Plaintiffs.

### The Usurious Loans

18.     TBL's first loan to Plaintiffs was made on or about April 25, 2014.  Over the course of the next few years, TBL extended other loans to Plaintiffs, as follows:

| DATE | AMOUNT | INTEREST | ALLEGED EQUITY |
|---|---|---|---|
| April 25, 2014 | $20,000 | 6% | 2% |
| October 1, 2015 | $50,000 | 20% | 3% (requested after) |
| December 2, 2016 | $150,000 | 20% | 3% (requested after) |
| April 18, 2017* | $150,000 | 15% (should be 10%) | 10% (condition unmet) |
| June 12, 2017* | $450,000 | 15% | |
| September 27, 2017* | $100,000 | 15% | |
| December 1, 2017* | $150,000 | 15% | |
| December 18, 2017* | $200,000 | 15% | |
| February 9, 2018* | $200,000 | 25% | 1% |
| June 6, 2018* | $400,000 | 30% | 3% |
| August 2, 2018* | $300,000 | 30% | 2% |
| January 17, 2019* | $400,000 | 20% | 5% (never issued) |
| July 31, 2019 | $100,000 | 15% | |
| Amended and Restated Promissory Note dated August 29, 2019 (incorporated the loans marked with asterisks (*)) at 15% interest starting January 1, 2020 | | | |
| Forbearance Agreement dated December 17, 2019 | | | |
| December 17, 2019 | $150,000 | 15% | |

19.     On paper, TBL was to have provided $2,820,000 in funds via loans to

Plaintiffs.  However, on information and belief, TBL did not provide the full $2,820,000.

20.     With the exception of the first loan dated April 25, 2014, the interest rate for every other loan was at least 15% and up to 30%.

21.     Each loan was purported to be governed under Arizona law.  However, after the Amended and Restated Promissory Note dated August 29, 2019 ("Amended Promissory Note"), the loans purported to apply California law.

22.     TBL requested equity in Paragon as additional and gratuitous consideration in exchange for entering into the April 25, 2014, April 18, 2017, February 9, 2018, June 6, 2018, August 2, 2018, and January 17, 2019 loan agreements with Plaintiffs.

23.     TBL received a stock certificate representing 10% of the equity in Paragon under the April 18, 2017 loan up front.  TBL was not entitled to any grant of equity under the April 18, 2017 loan because it failed to fulfill its obligations under that loan—namely, to help secure a separate lending deal with third parties within 30 days of execution.  When Hudson confronted Harvey Belfer about TBL's failure, Harvey Belfer grew enraged, shouting at Hudson and reminding Hudson he had done so much for Plaintiffs.  Harvey Belfer told Hudson that he did not want to make an enemy out of Harvey Belfer, and Harvey Belfer threatened to demand all his money back unless Plaintiffs acquiesced.  In the face of these threats, Plaintiffs had no choice but to stand down.

24.     In addition, the interest rate on the April 18, 2017 loan and all subsequent loans should have been 10%.  TBL continued to charge the higher 15% rate and Plaintiffs did not object because Hudson feared for his safety.  TBL also agreed not to ask for any additional equity in Paragon after this loan.

25.     Although not stated anywhere on the loan agreements, TBL had requested Plaintiffs provide additional equity in Paragon for the October 1, 2015 and December 2, 2016 loans as "sweeteners."  Harvey Belfer threatened Hudson in the event Plaintiffs did not, in fact, provide such equity, stating that it was better to have Harvey Belfer as a "friend than an enemy."

26.     Plaintiffs delivered stock certificates to TBL totaling 24% of the Class A

common stock in Paragon.

27.     Harvey Belfer also requested that Paragon issue 5% equity to Todd Belfer in connection with the January 17, 2019 loan as an additional sweetener.  Robert Lunny pushed to renegotiate interest on outstanding loans, and Harvey Belfer was open to this suggestion if Plaintiffs gave Todd Belfer equity in Paragon as such a grant would make Harvey Belfer "happy" and would allow Todd Belfer to increase his involvement in Paragon.

28.     Plaintiffs therefore delivered a stock certificate for 5% equity in Paragon to Todd Belfer in connection with the January 17, 2019 loan, which Todd Belfer later transferred to TBL.

29.     TBL is not entitled to any shares in Paragon.  At most—and without waiving any claims or rights—TBL obtained only up to 2% of Paragon's Class A common stock as additional (and gratuitous) consideration for having provided loans to Paragon.

30.     In or about August 2019, Paragon underwent a 100:1 stock split such that the 10,000 shares of Class A stock were increased to 1,000,000 shares total, combined, in Class A voting stock and Class B non-voting stock.  TBL's 2,900 shares of Class A common stock (including Todd Belfer's 5% equity stake) thus became 290,000 shares of Class B common stock.

31.     The Amended Promissory Note incorporated the loans and amounts of the loans marked by asterisks in the chart above, and had a stated value of $1,819,830.00.  The Amended Promissory Note, as stated above, is governed by California law.    The $1,819,830.00 stated value of this note includes capitalized interest that was charged on incorporated loans that ranged from rates of 15% to 30% interest.

32.     On or about December 17, 2019, Plaintiffs entered into one other loan with TBL after the Amended Promissory Note for $150,000 at 15% interest.  This loan is governed by California law.

33.     As of the date of this Complaint, Plaintiffs are fully current with all repayment obligations on their loans with TBL.

### **TBL's Conspiracy to Take Over Plaintiffs**

34.   As a result of the loans and the additional gratuitous awards of equity in Paragon, TBL was both the primary lender to Plaintiffs and a minority shareholder in Paragon.  TBL used both statuses as leverage in its campaign to take over Plaintiffs.

35.   The Co-Conspirators' first move in or about October 2018 was to cause James Power and Jeff Swisher, who were employees of Plaintiffs in charge of operations and payouts, to leave Plaintiffs and use their proprietary knowledge to set up a new competing entity called 4TH POWER TECHNOLOGY LLC ("4th Power") in Arizona.

36.   Fortunately for Plaintiffs, they had competent and loyal employees who were able to step in and prevent any disruptions in business operations, and Plaintiffs were able to terminate James Power and Jeff Swisher in time.

37.   Undeterred, Harvey Belfer caused Plaintiffs to hire Robert Lunny as Paragon's Chief Financial Officer and Chief Operating Officer, as well as a director, heralding Robert Lunny as a business and financial wizard.  In truth, Robert Lunny was installed to act as Harvey Belfer and TBL's "eyes and ears" and to set about events that would likely have caused Plaintiffs to default on loan payments to TBL, thereby providing TBL with all of Plaintiffs' shares and the ability to quickly sell the company for a large profit for TBL.

38.   In the less than one year Robert Lunny was employed by Plaintiffs, he resoundingly showed his divided loyalties and sheer incompetence.  Robert Lunny's disastrous tenure with Plaintiffs lasted from March 1, 2019 to January 24, 2020.

39.   Concurrently with Robert Lunny's installation as an officer and director of Paragon, Todd Belfer and TBL recommended Plaintiffs retain a Scottsdale law firm, WEISS BROWN, PLLC ("Weiss Brown"), to draft loan documents that would effectively cede control of Plaintiffs to the Co-Conspirators, as well as to act from that point forward as corporate counsel.

40.   Although Weiss Brown was formally retained by Paragon on or about February 11, 2019, neither Weiss Brown nor Co-Conspirators revealed to Plaintiffs that

Weiss Brown had represented Todd Belfer and his investment company, CANAL PARTNERS, LLC, in the past.

41.   Weiss Brown improperly conferred with at least Todd Belfer on these loan documents, ultimately drafting documents that were so one-sided and favorable to TBL that Plaintiffs were compelled to find new and independent legal counsel.

42.   At 10:44 am on April 26, 2019, Rick J. Lopez of Weiss Brown sent an email to Hudson and Todd Belfer, among others, regarding entitled "Paragon / Gatsby/ Want LLC -- Reorganization Documents (WB 4.26.19)."   This email contained a zip file attachment with 175 pages of documents relating to crucial corporate actions, including reorganizations of Plaintiffs, and loan modifications.   In particular, some of these documents provided for onerous loan terms for Plaintiffs, including 100% pledges of Hudsons' shares, personal guaranties, and provisions increasing TBL's control over Plaintiffs' corporate affairs.   Other terms included unilateral attorneys' fee provisions awarding fees *only* to TBL for any breaches of the agreement, granting control over the board of directors of Paragon to TBL, and requiring a vesting schedule for Hudson's shares in Paragon.

43.   Yet, despite the number of pages and the importance of these documents to the fate of Plaintiffs, Mr. Lopez wrote that there was "[n]o need to review before today's call," which was to take place at 3:30 pm that very same day.

44.   During this April 26, 2019 call, which was recorded with the permission of all participants, Hudson challenged Weiss Brown, TBL, Harvey Belfer, Todd Belfer, and Robert Lunny about the necessity of the documents and about the extraordinarily one-sided terms.  Hudson questioned why Weiss Brown, which should have been acting as Paragon's counsel, was recommending courses of action that would completely favor TBL.

45.   As a result of this call, Plaintiffs retained their own independent legal counsel—this time located in California and not associated with TBL in any way—who confirmed Plaintiffs' conclusions.  Plaintiffs did not sign the documents prepared by Weiss Brown.

46.    When this Trojan Horse with Weiss Brown did not succeed, TBL fell back on its inside man, Robert Lunny, who as CFO/COO held enormous sway over Plaintiffs.

47.    In addition to presiding over numerous errors—including mismanaging payments so that Plaintiffs had a cash flow issue such that they might not have been able to make timely loan repayments to TBL—Robert Lunny coerced Plaintiffs to enter into the December 17, 2019 loan for $150,000, repeatedly warning Plaintiffs that without this loan there would be drastic consequences, including having to cease operations.

48.    This loan had draconian terms, including personal guaranties and pledges of 100% of Plaintiffs' owners shares.  Indeed, TBL wanted to remove both Hudson and his wife to be removed from all company bank accounts and for Robert Lunny to have full control over the operating budget, giving him the power to hire and terminate employees as well as to adjust salaries.  This would mean that Robert Lunny, not Hudson and his wife, would have effective control over the company.

49.    In addition, while acting as their trusted CFO/COO, Robert Lunny caused Plaintiffs to believe they would not be able to make a loan repayment in or about December 2019, which led directly to Plaintiffs signing, under duress and under false pretenses, a Forbearance Agreement on December 17, 2019 that significantly increased TBL's control over Plaintiffs.

50.    Robert Lunny hounded Hudson to sign the Forbearance Agreement, even going so far as to have it sent via DocuSign to Hudson after working hours and not allowing Hudson adequate time to have the Forbearance Agreement reviewed by independent legal counsel.

51.    Now, months later and after a thorough investigation, Plaintiffs have determined that Robert Lunny's statements were not only untrue, but specifically intended to cause Plaintiffs to enter into the December 17, 2019 loan agreement and Forbearance Agreement—agreements that were not only unnecessary, but specifically calculated to allow the Co-Conspirators to take over Plaintiffs in the event of breach or default.

52.    With these unconscionable loan agreements in place, and with Robert Lunny

burrowed inside the corporate apparatus and James Power and Jeff Swisher waiting in the wings to take over day-to-day operations, the Co-Conspirators fomented various conflicts to try to get Plaintiffs to breach the loan agreements. Their end goal was to cause breach or default, which would effectively transfer control of Plaintiffs to the Co-Conspirators.

53.     Unfortunately for the Co-Conspirators, Plaintiffs did not breach or default on the loan agreements. Because of this, the Co-Conspirators concocted a Gulf of Tonkin-type incident to serve as the pretext for a shareholder derivative lawsuit by TBL against Plaintiffs' principals, *To Be Limited Partnership v. Jude Hudson, et al.* (C.D.Cal. Case No. 2:20-cv-03238-JFW-MAA) (the "Shareholder Derivative Action"). The Shareholder Derivative Action was filed on April 7, 2020.

54.     TBL then filed an amended complaint, an *ex parte* application for a temporary restraining order and order to show cause on a preliminary injunction, *and* a motion to appoint a receiver over Plaintiffs on April 20, 2020—all before the actual complaints were ever served on Plaintiffs.

55.     Fortunately for Plaintiffs, Robert Lunny's ego got the best of him and he told Hudson in their last verbal exchange that "he better get a good lawyer" and laughed that he was about to get a rude surprise. This tipped Plaintiffs off to a potential legal action coming from TBL and allowed them critical time to source legal counsel.

56.     The *ex parte* application was denied and the motion to appoint a receiver was stricken by the court.

## PLAINTIFFS' FIRST CLAIM FOR RELIEF:
## FRAUD
## (AGAINST HARVEY BELFER)

57.     Plaintiffs reallege and incorporate by reference the prior and subsequent paragraphs of this Complaint.

58.     In the first week of April 2017, Hudson had a breakfast meeting with Harvey Belfer, Allen Weintraub, and Aaron Lee at the Morning Squeeze restaurant in Scottsdale, Arizona. Harvey Belfer owns the Morning Squeeze chain of restaurants.

59.     The parties at this meeting discussed the need for Plaintiffs to secure $900,000 in funding to allow iwantclips.com to grow and remain competitive.

60.     Harvey Belfer made verbal statements in which he made certain promises on behalf of TBL, as well as the statement that his value to Plaintiffs was as a "private bank," and that either he or his personal network would be able to provide money so long as Plaintiffs were able to repay it.

61.     During this meeting, Harvey Belfer assured Jude Hudson that he would immediately facilitate such agreeable lending deal, and represented to Jude Hudson that such a deal was a foregone conclusion.

62.     In fact, Harvey Belfer had invited Weintraub to this breakfast meeting for the express purpose of securing funding for Plaintiffs.  Weintraub stated that he was a loan broker and that he would not have any difficulties in finding Plaintiffs a $900,000 loan at 10% interest or below.

63.     Hudson, on behalf of Plaintiffs, requested a short-term, interest-free bridge loan of $150,000.

64.     Harvey Belfer, on behalf of TBL, verbally agreed to provide such a loan.  In addition, Harvey Belfer promised to facilitate an agreeable lending deal within 30 days between Paragon, on one hand, and individuals such as Allen Weintraub and Scott Ferguson, on the other.

65.     This verbal conversation and Harvey Belfer's verbal promises were memorialized in a written loan agreement dated April 18, 2017, as follows below.

66.     If Harvey Belfer did not facilitate any suitable deal with any lenders within 30 days of the date of the agreement, the parties agreed that the bridge loan would convert into a one-year interest only loan at 10% interest, with the full principal due on or before April 18, 2018.

67.     However, if Harvey Belfer was able to facilitate a deal between lenders and Plaintiffs, TBL was to receive 10% equity in Paragon.  Harvey Belfer insisted that TBL be issued this 10% equity in Paragon at the signing of the agreement, despite the conditional

nature of this incentive.

68.     In addition, Plaintiffs and TBL agreed that should any lending arrangement not materialize, as Harvey Belfer had promised, TBL would provide up to $750,000 in additional loans to Plaintiffs at 10% interest.

69.     At the time he made his verbal representations to Hudson at the Morning Squeeze in April 2017, Harvey Belfer had no intention of actually following through with his promises to facilitate a suitable lending arrangement with anyone.

70.     Indeed, Harvey Belfer intended for these promises to induce Hudson to enter into an agreement binding Plaintiffs.

71.     Weintraub's presence was meant to add credibility to Harvey Belfer's statements made at the Morning Squeeze, but this was part of Harvey Belfer's scheme.

72.     Harvey Belfer further intended to enter into this agreement in order to obtain 10% more equity in Paragon, for which he did not intend to pay any consideration.  This is why Harvey Belfer insisted upon Paragon providing the 10% equity to TBL immediately upon signing of the agreement on April 18, 2017.

73.     With the 10% equity in hand, all Harvey Belfer needed to do was sit and do nothing and wait for the 30-day loan period to expire, at which point the loan would automatically convert into a one-year term loan at 10% interest.

74.     Harvey Belfer intentionally failed to broker a suitable lending deal, and furthermore intentionally failed to cause TBL to provide the additional promised $750,000 after April 18, 2017.

75.     It was not until December 1, 2017 that TBL provided this additional $750,000.

76.     Furthermore, although TBL, through Harvey Belfer, had agreed that all funds provided by TBL under this agreement would be at 10% interest, TBL charged 15% on the entire $900,000.  Indeed, Harvey Belfer, on behalf of TBL, had agreed that *any* further loans to Plaintiffs would be at 10% interest and equity-free.

77.     On or about December 1, 2017, Hudson and Harvey Belfer were again having breakfast at the Morning Squeeze in Scottsdale, Arizona.  Hudson confronted Harvey

Belfer about TBL's failures to broker a lending agreement with third parties and the nearly eight-month delay in providing the additional $750,000, and requested the interest rate be reduced from 15% to the agreed-upon 10% as well as a return of the 10% equity. When confronted, Harvey Belfer threatened Hudson's physical safety and told him in no uncertain terms that Hudson would not want Harvey Belfer as an enemy, and further threatened to take his money back from Plaintiffs.

78.    When Harvey Belfer made his verbal representations on behalf of TBL to Hudson in early April 2017, therefore, he had absolutely no intention of performing the promises he made on behalf of TBL.

79.    In fact, Harvey Belfer only intended to lock Plaintiffs into a 15% interest loan and to effectively steal 10% equity in Paragon, as evidenced by the fact that he insisted that Plaintiffs provide the 10% equity to TBL immediately upon signing the agreement.

80.    Harvey Belfer, on behalf of TBL, intended that Hudson and Plaintiffs rely on his promises to enter into the written agreement.

81.    Hudson, on behalf of Plaintiffs, signed the agreement in reasonable reliance on Harvey Belfer's promises on behalf of TBL.

82.    As a direct and proximate result of relying on Harvey Belfer's promises on behalf of TBL, Plaintiffs were injured in an amount to be proven at trial, but at least $900,000.

83.    As a direct and proximate result of relying on Harvey Belfer's promises on behalf of TBL, Plaintiffs were also injured by being deprived of 10% equity in Paragon.

84.    Plaintiffs are informed and believe, and on that basis allege, that in doing the acts described above, Harvey Belfer acted with malice and with the specific intent to injure Plaintiffs. Plaintiffs therefore seek an award of punitive damages in an amount to be determined at the time of trial.

//

//

//

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## SECOND CLAIM FOR RELIEF:

## FRAUD

## <u>(AGAINST TODD BELFER AND DOES 1 – 10)</u>

85.     Plaintiffs reallege and incorporate by reference the prior and subsequent paragraphs of this Complaint.

86.     In early February 2019, Hudson had verbal conversations at the Morning Squeeze with Harvey Belfer, Todd Belfer, and Robert Lunny regarding consolidating and restating all of Plaintiffs' loans with TBL.  Many of the loan documents had been prepared by laypersons, and Todd Belfer, in particular, stated his concerns that they were legally insufficient.

87.     Todd Belfer has a bachelor's degree in finance and a real estate degree from the University of Arizona, and has billed himself as a serial entrepreneur.

88.     Todd Belfer recommended to Hudson that he retain Weiss Brown, an Arizona law firm.  Hudson thought this was odd at the time, given that Plaintiffs were at this time based in California and would likely need California-licensed attorneys.  However, Hudson acquiesced based on Todd Belfer's assurances that Weiss Brown was an excellent law firm.

89.     Weiss Brown was formally retained by Paragon on or about February 11, 2019.

90.     At no time did either Weiss Brown or Todd Belfer ever reveal to Hudson that Weiss Brown had done work with Todd Belfer and Canal Partners, LLC in the past and, on information and belief, was still doing work for Todd Belfer.

91.     Therefore, Todd Belfer intentionally failed to disclose the material information about potential conflicts of interest to Plaintiffs, and on information and belief, requested Weiss Brown stay silent on this issue as well.

92.     On April 26, 2019, as described above, Hudson confronted Weiss Brown and Todd Belfer about the extraordinarily one-sided loan documents, which if signed would have ceded significant control of Plaintiffs to TBL and its proxies and would have exposed Hudson and his wife to great potential liability.

93.     Todd Belfer, on behalf of TBL, intended that Hudson and Plaintiffs rely on his representations that Weiss Brown was neutral and effective counsel, when in fact they were anything but.

94.     Todd Belfer, on behalf of TBL, intended that Hudson and Plaintiffs rely on Weiss Brown's legal advice and documents under the mistaken belief—fostered by Todd Belfer and Weiss Brown's statements and nondisclosures—that the 175 pages of documents to be reviewed and signed in less than five hours would consolidate and restate all loans between Plaintiffs and TBL in a fair and equitable manner.

95.     Hudson, on behalf of Plaintiffs, had relied on Todd Belfer and Weiss Brown to prepare extensive, complicated loan and corporate restructuring documents.

96.     Hudson did not sign these documents on behalf of Plaintiffs, but Plaintiffs were forced to pay Weiss Brown's fees as well as the fees for Plaintiffs' own independent legal counsel.

97.     As a direct and proximate result of relying on Todd Belfer's representations, and as a direct and proximate result of Todd Belfer's nondisclosures of potential conflicts of interest between Plaintiffs and Weiss Brown, Plaintiffs were injured in an amount to be proven at trial, but at least $200,000.

98.     Plaintiffs are informed and believe, and on that basis allege, that in doing the acts described above, Todd Belfer acted with malice and with the specific intent to injure Plaintiffs. Plaintiffs therefore seek an award of punitive damages in an amount to be determined at the time of trial.

**THIRD CLAIM FOR RELIEF:**

**CONVERSION**

**<u>(AGAINST TBL)</u>**

99.     Plaintiffs reallege and incorporate by reference the prior and subsequent paragraphs of this Complaint.

100.    TBL has in its possession stock certificates in Paragon representing anywhere up to 29% of its Class B common stock, at least 27% of which were coerced from Paragon

17

COMPLAINT

through fraud and breach of contract as described in this Complaint, and taken without proper consideration.

101.   On information and belief, TBL holds these stock certificates in its name and/or the name of a related entity, To Be Limited LLC.

102.   Californian law allows conversion claims for classes of property represented by documents, such as stock certificates, as well as the actual shares represented by those certificates.

103.   Paragon owned this 27% of its Class B common stock.

104.   TBL substantially interfered with Paragon's property by knowingly and intentionally taking possession of the stock certificates, and the shares which they represent, through subterfuge, fraud, and breach of contract as described in this Complaint.

105.   Plaintiffs did not consent to this possession, as evidenced by Hudson's conversation on or about December 1, 2017 with Harvey Belfer of TBL asking for a return of 10% of the equity in Paragon.  Hudson, on behalf of Plaintiffs, did not object more vociferously because he was afraid for the safety of himself and his wife.

106.   Harvey Belfer, on behalf of TBL, intentionally failed to return any equity or stock certificates in Paragon when asked, and indeed threatened Hudson with physical harm on the occasion when Hudson requested their return.

107.   On information and belief, the stock certificates evidencing a 27% equity stake in Paragon are worth at least $1,300,000.

108.   As a direct and proximate result of TBL's above-described conversions, Plaintiffs have been damaged in an amount to be determined at trial, but at least $1,300,000.

**FOURTH CLAIM FOR RELIEF:**

**BREACH OF CONTRACT**

**<u>(AGAINST TBL)</u>**

109.   Plaintiffs reallege and incorporate by reference the prior and subsequent paragraphs of this Complaint.

110.   As set forth in Plaintiffs' first claim for relief for fraud against Harvey Belfer,

Plaintiffs and TBL entered into a contract on or about April 18, 2017 in which TBL agreed to provide a 30-day interest-free bridge loan to Paragon and procure a lending arrangement by which Plaintiffs could borrow funds from third parties, and, if that arrangement did not materialize, loan a total of $900,000 to Plaintiffs at 10% interest.

111.   In exchange, Plaintiffs provided TBL with 10% equity in Paragon—upfront, as insisted upon by Harvey Belfer.

112.   TBL breached this agreement by failing to procure a third-party lending arrangement for Plaintiffs.

113.   TBL further breached this agreement by charging 15% interest on the $900,000 to Plaintiffs instead of 10%.

114.   TBL further breached this agreement by keeping the 10% equity stake in Paragon despite not having procured a suitable third-party lending arrangement for Plaintiffs.

115.   Plaintiffs performed all of their obligations under this agreement.

116.   TBL was not excused from any performance or its obligations under this agreement.

117.   As a direct and proximate result of the above-described breaches of the agreement, Plaintiffs have been damaged in an amount to be determined at trial, but no less than $750,000.

## FIFTH CLAIM FOR RELIEF:
## VIOLATION OF CALIFORNIA USURY LAW PURSUANT TO
## CIVIL CODE § 1916-2
## (AGAINST HARVEY BELFER, TODD BELFER, AND TBL)

118.   Plaintiffs reallege and incorporate by reference the prior and subsequent paragraphs of this Complaint.

119.   The Amended Promissory Note dated August 29, 2019 contains illegal interest rates, calling for 15% interest, as well as increased interest rate penalties of 3% for late payment (thus totaling 18%).

120.   California usury law which sets the legal rate of interest for any loan or forbearance for commercial purposes at 12%.  Therefore, the Amended Promissory Note on its face violates California usury law.

121.   Under Civil Code section 1916-3, a court may allow Plaintiffs to recover treble the amount of money so paid or value delivered where the interest rate under a loan agreement is in violation California usury law.

122.   In addition, Plaintiffs and TBL entered into two separate loan agreements on July 31, 2019 for $100,000 and December 17, 2019 for $150,000, both at interest rates of 15% and a default interest rate of 3% (totaling 18%).

123.   Therefore, for a combined $2,069,830, Plaintiffs have paid approximately $748,487 in interest to-date on the Amended Promissory Note (and the loans incorporated into the Amended Promissory Note), the July 31, 2019 loan, and the December 17, 2019 loan, and are still making interest payments on these loans as of the date of this Complaint.

124.   Hudson and his wife are personal guarantors of these loans, and at all relevant times, Plaintiffs had assets under any applicable threshold under relevant usury law.

125.   Such money paid by Plaintiffs to TBL (and distributed to Harvey Belfer and Todd Belfer, along with the other partners of TBL), totaling approximately $748,487, should therefore be trebled to an amount of  $2,245,461 and awarded to Plaintiffs pursuant to Civil Code section 1916-3.

## SIXTH CLAIM FOR RELIEF:
## MONEY HAD AND RECEIVED – RECOVERY OF USURIOUS
## INTEREST PAID
## (AGAINST HARVEY BELFER, TODD BELFER, AND TBL)

126.   Plaintiffs reallege and incorporate by reference the prior and subsequent paragraphs of this Complaint.

127.   As described in Plaintiffs' fifth claim for relief above, Plaintiffs have paid approximately $748,487 in interest on usurious loans to TBL.

128.   As of the date of this Complaint, Plaintiffs are still making interest payments

on the loan agreements discussed specifically in Plaintiffs' fifth claim for relief above.

129.   Such money paid by Plaintiffs to TBL (and distributed to Harvey Belfer and Todd Belfer, along with the other partners of TBL), totaling approximately $748,487, must be returned to Plaintiffs.

**SEVENTH CLAIM FOR RELIEF:**

**RECISSION OF FORBEARANCE AGREEMENT PURSUANT TO**

**CIVIL CODE § 1689(b)(1)**

**<u>(AGAINST TBL AND DOES 1-10)</u>**

130.   Plaintiffs reallege and incorporate by reference the prior and subsequent paragraphs of this Complaint.

131.   Plaintiffs entered into a Forbearance Agreement with TBL dated December 17, 2019.

132.   Pursuant to that Forbearance Agreement, TBL agreed to forbear on one interest payment of $22,747.88 due in December 2019, and to forbear on such payments until March 1, 2020.

133.   However, in exchange for such forbearance, TBL exacted numerous concessions from Plaintiffs, including limitations on shareholder loans, annual salaries or raises, and the removal of Hudson as a signatory on company bank accounts.

134.   As described in this Complaint, Robert Lunny—in concert with his Co-Conspirators—misrepresented Plaintiffs' ability to pay the December 2019 interest payment and Plaintiffs' financial situation, and coerced Plaintiffs into signing without providing time for independent financial or legal review of the Forbearance Agreement (and other loan documents totaling 46 pages).  Thus, Plaintiffs entered into the Forbearance Agreement under duress.

135.   This was part of TBL and its Co-Conspirators' campaign to take over Plaintiffs.

136.   As a result of this duress, Plaintiffs are entitled to rescission of the Forbearance Agreement.  This Complaint shall serve as notice of Plaintiffs' intent to

rescind the Forbearance Agreement.

## EIGHTH CLAIM FOR RELIEF:
## RECISSION OF LOAN AGREEMENTS PURSUANT TO
## CIVIL CODE § 1689(b)(2)
## (AGAINST TBL AND DOES 1-10)

137.   Plaintiffs reallege and incorporate by reference the prior and subsequent paragraphs of this Complaint.

138.   Plaintiffs entered into five separate loan agreements through which TBL allegedly obtained a total of 18% equity in Paragon: April 25, 2014 (2%); April 18, 2017 (10%); February 9, 2018 (1%); June 6, 2018 (3%); and August 2, 2018 (2%).

139.   However, each of these loan agreements were just that: loan agreements. The return consideration for these loans was exorbitant interest—up to 30%!

140.   No proper or adequate consideration was paid for the equity that was added as a "sweetener" for TBL: TBL did not pay fair value for this equity. This conclusion is supported by the fact that TBL aggressively insisted upon, and allegedly received, 6% in equity in Paragon in connection with the October 1, 2015 and December 2, 2016 loans, despite no mention whatsoever of a grant of equity in those two loan agreements.

141.   At the time these agreements were entered into, Plaintiffs did not know they were not supported by adequate consideration.

142.   As a result of this duress, Plaintiffs are entitled to rescission of the April 25, 2014, April 18, 2017, February 9, 2018, June 6, 2018, and August 2, 2018 agreements. This Complaint shall serve as notice of Plaintiffs' intent to rescind these agreements.

## PRAYER FOR RELIEF

Wherefore, Plaintiffs pray for relief and judgment against Defendants, as follows:

1.   For compensatory damages, in an amount to be proven at trial but above the jurisdictional limit.

2.   For special damages, in an amount to be proven at trial.

3.   For punitive damages, in an amount to be proven at trial.

4.      For interest.

5.      For costs of suit.

6.      For attorneys' fees.

7.      For such other relief as the Court may deem just and appropriate.


DATED:  March 23, 2021                            **NOVIAN & NOVIAN, LLP**

                                    By:    /s/ Farhad Novian
                                           FARHAD NOVIAN
                                           JOON SONG

                                           Attorneys for Plaintiffs PARAGON
                                           TECHNOLOGY & DEVELOPMENT, INC.
                                           and GATSBY ENTERPRISES, INC.

1

## **DEMAND FOR JURY TRIAL**

2         Plaintiffs PARAGON TECHNOLOGY & DEVELOPMENT, INC. and GATSBY

3     ENTERPRISES, INC. hereby demand a jury trial in this action.

4

5     DATED:  March 23, 2021          **NOVIAN & NOVIAN, LLP**

6                  By:   /s/ Farhad Novian

7                     FARHAD NOVIAN

8                     JOON SONG

9                     Attorneys for Plaintiffs PARAGON

10                    TECHNOLOGY & DEVELOPMENT, INC.
                and GATSBY ENTERPRISES, INC.

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28